Bay, J.
delivered the opinion of the Court.
This is a case which came before the Circuit Court of Charleston District, in May Term, 1811, Mr. Justice Grimke presiding, "by way of an appeal from the Court Ordinary: m which an issue x " made up, to try whether the late Mrs. Elizabeth Hardcastle died testate or intestate ? and the jury to whom the issue was sent, found for her intestacy. And it has now come up before this Court upon a motion to set aside that verdict, and to grant a new trial, upon the grounds particularly set forth in the brief.
It is not my intention to go into that mass of testimony which was before the Court of Ordinary,as it would lead me into a labyrinth, from which I fear I should not be able easily to extricate myself. There is, however, a still stronger reason with me for not doing so, and that is, because I conceive it is unnecessary, in the consideration of the question now before the Court. I shall only take notice of such parts of it as I think material. Suffice it, at present, to observe,, that from the testimony adduced, it appears that Mrs. Hardcastle made a will, in due form of law, some years ago; but, for reasons best known to herself, she thought proper to cancel that will: and, on the 13th or 14th of December, 1808, she made and executed a second will, with the usual and requi *217 site solemnities; and after it was executed, it was sealed up, and deposited in a trunk or box for safe keeping, which the Ordinary decreed to be a good and valid will. In the course of the testimony before the Ordinary, the contents of both these wills were pretty fully proved. In the first of these wills, Mrs. Dudley, then a widow, now Mrs. Netting, who it appears was a near relation of the deceased, and once a favourite of hers, was handsomely provided for; but in the second will her name was not even mentioned, and the bulk of the old lady’s fortune was given to the family of Mr. Palmer. Although a legacy was given in it to Mrs. Netting's son, it appeared further from the testimony that, for some reason or other, the old lady had got displeased with her relation, Mrs. Netting, which accounts in some degree for her name being left out of this second will. About this period, it appears that Mrs. Dudley intermarried with Dr. Nelling; and soon after the marriage, Dr. and Mrs. Netting went up to St. John’s, and paid the old lady a visit, whom they found very sick and much indisposed; that she received her relation, Mrs. Netting, with great cordiality, and apparent affection. Whether there had been any explanation asked or given of the cause of the old lady’s displeasure, does not appear frotó any part of the testimony; but it is highly presumable that something of the kind must have taken place, as she soon after gave Mrs. Netting, who had formerly lived, with her* *218 ker keJs’ and charge of her house, and expressed herself in terms of respectful regard for Dr. Netting, whom, it does not appear, she had ever seen before.
At this stage of the case it is necessary to observe, that the appellant, from the decision of the Court of Ordinary, which had decreed in favour of the second will, or defendants, in the Court below, offered to give evidence of the intestacy of Mrs. Hardcastle, by proving that she in her life -time cancelled or destroyed this second will, by which means 6he became intestate, and died without making any other last will and testament ; and for this purpose offered to call Dr and Mrs. Netting as witnesses, who were objected to by the appellees, (defendant in the issue below,) on the ground of interest, it being alleged that if this last will was set aside, Mrs. Netting would come in for a considerable share of the deceased’s estate. Whereupon the counsel for plaintiff produced a release from Dr. and Mrs. Netting, of all the right, title, and interest, in, to, or out .of, the estate of the deceased, which she might be entitled to, in favour of Francis Kinloch, Esq. the plaintiff in this issue; upon the production of which, the Court below adjudged them competent witnesses. Dr. Netting was then sworn, and he declared., that on the 20th December, 1808, lie and his wife went to Mrs. Hardcastlé’s; that she was confined to her chamber, but not to her bed. That some time -after his. arrival, he went *219 into.her chamber, and saw her: that Mrs. Nell-mg was then in the room; that Mrs. Hardcastle informed, the witness that Mrs. Palmer had often spoken .ill of Mrs. Netting, but that she was vinced, without cause ; that before Mss. Netting came, Mr. Palmer had made her will, but she did not know its contents; that she was very much offended with Mrs. Palmer, and wished she would make her no more visits ; that she had put aside the will made for her by Mr. Palmer, and as soon as she got better she would make another; that he advised her to make another, but she said she was too ill, but if she got better she would do so. That she was then sitting in an easy chair; she seldom laid down; she died sitting in an easy chair. That on the day after he arrived, he again conversed with her about the will; advised her to call in Mr. Palmer and two or three friends, and have her will drawn. She replied, “ Hang Mr. Palmer; I want to have nothing to do with him; that he had deceived her in the first instance, and she would not trust him again.” He then- advised her to call Mr. Piere and Mr. Roberts, observing life was uncertain, and that she would not die the sooner.' She said she would do so as soon as she got better. That her conversation was very much in the same strain until the day before she died; she then said if her will was not made, they would have a great deal of trouble with the Pahners. She told the witness, the 4th or 5th day after his arrival, that *220 she had destroyed the will, not knowing the contents ; that she had burnt the will when Mrs. Netting and one of the servants were present; she also said she had given her keys to Mrs; Netting; that it was always her intention to leave the chief of her property to Mrs. Netting, and her son afterwards; that it was not observed that she was blind until the morning of her death; that she was in the habit of sitting close to the fire, and died in the morning about 8 or 9 o’clock.
Mrs. Netting was then sworn. She said she arrived at the deceased’s house on the 20th December, 1808, about 10 o’clock in the morning; that the deceased sent for her into her bed-room, received her cordially, and inquired about her daughter, and told her how sick she had been; that she, the witness, asked her if her affairs were settled to her wish ? She answered ho: that Mr. Palmer had made her will, but she did not know what was in it, and was not satisfied about it. Witness said, I hope you will not let it be so, without knowing the contents of your will; that she then called a servant, and told her to bring a certain box; that upon the servant’s bringing the box, she opened it, took out the will, and burnt it; that witness read the will aloud to her; that while she was reading it the deceased looked over her, and when the witness came to that part of it which related to the Palmer family, the deceased jerked it out of her hands, tore it a little, and put it into the fire; that part *221 of the will went into the fire, and part fell out • that the part which iell out was pushed into the fire by a negro girl. That the deceased said Palmer had acted by her as he had done when he got hej to buy JYewman's land. That witness observed to her, that Mr. Palmer had burnt her other will, to which she said, she did not know that he had done so : that after this she almost fainted; but when she came to, she ordered the servant to bring her keys to her, which she gave to the witness; told her to take care of them, and see that nothing was taken. That on the next day Mrs. Palmer came to the deceased’s house to set up with her, but she told her she had enough, she did not want her: that 'Mrs. Palmer, notwithstanding, remained there. That on the day after, Mr. Palmer came to the deceased’s house, and, in the presence of Mrs. Lehie, M-Connor, and herself, said to Mrs. Hardeastle, Madam, I demand yow will. That the deceased, raising herself up a little, asked what right, he had to demand her will? That Mr. Palmer then said to witness, Madam, I demand the key of the press. That M-Comor then said to him, For God’s sake don’t distress the dying woman. Upon which Mr. Palmer said, if he said another word he would turn him out of the room. M-Connor then went out, and Palmer followed him. That Mr. Palmer afterwards said to deceased, he would fight her at the point of the needle: she answered, very well, we shall see, if *222 I get better. That the Palmers, Mrs. Lehie, and Mrs. Quere, came backward's and forwards until the day before the death of the deceased. That ' when Mrs. Palmer turned to the deceased and said, give .me your keys, witness asked what she wanted with them; she said; the will: that witness then said, she would give no will out of her possession. That she asked the reason why? Witness then replied, she had her reasons. That after Mrs. Hardcastlds death, Mr. Piere came to the house, and she, the witness, delivered the keys to him. That a search was then made, and no will was found. That a day or two after the funeral, the witness told Mr. Palmer Mrs. Hard-castle had destroyed the will. The witness then produced a paper, containing the heads of the first will made by the deceased, in her own hand writing. She also saw, it was on the third day after the deceased had destroyed her will, that Mrs. Palmer first demanded the keys of her to get it; and that the will had been destroyed in the morning, a little time after breakfast. This appears to be the whole of the testimony before the Jury, respecting the destruction of the second will by the deceased, Mrs. Hardcastle herself, a few days before her death. Doctor and Mrs. JYelling, both swear positiv ely on the subject : The former that, The deceased, Mrs. Hard-castle, had told him she had put the will aside, which hadbsen made for her by Mr. Palmer, and that, as soon as she got beiler, she would make another; *223 and a few days afterwards, again she told him, that she had destroyed the will, not knowing its contents;, adding, that she had burnt it when Mrs. ing, and one of the servants, were present. latter, Mrs. Netting, on her part swears, that when she,asked her if her affairs were settled to her wish, she answered, ho. That Mr. Palmer had made her will, hut she did not know what was in it, and was not satisfied about it. That she then called a servant and desired her to bring a certain box, that she opened it and took out the will and burnt it. ' That witness first read it aloud to her; that while she was reading it the deceased looked over her, and when witness came to that part of it which related to Mr. Palmer, the deceased jerked it out of her hands, tore it," and threw it into the fire: that part fell out, but was pushed into the fire by a negro girl. Part of this testimony appears to be corroborated by the witnesses to the execution of the will; for they say, the contents were not read over to her at the time of the execution of the will by the testatrix. Mrs. Palmer, however, said it was read over to lier, probably not in the hearing of the witnesses, but whether she understood its contents or not is uncertain, at the time she executed it; but be this fact as it may, it appears she afterwards declared she did not know its contents; that she did not knoio what was in it, and that was one of the. reasons assigned by-her, to both the witnesses, for its destruction, and of her intention to make *224 another will as soon as she got better. It is by no means improbable, but in her weak and feeble state, she did not recollect the contents of the will, or if she did, that her returning affection for her relation, Mrs. Netting, might have induced her to cancel it. On the part of the appellees it was urged, that the two witnesses, Doctor and Mrs. Netting, were highly interested in the des-' traction of this will, and therefore were unworthy of credit. And, secondly, that the old lady was not possessed, at the time of the aniiims cancellendi, or that tranquil state of mind necessary to have enabled her to judge of the propriety, or impropriety of such a measure; and, therefore^ it is presumed some fraud must have been practised upon her in her weak debilitated situation. In answer to the first objection, I would beg leave to observe, that upon the production of the release from Doctor and Mrs. Nllling, to Mr. Kin-loch, their incompetency, on the score of interest, was removed, and they stood rude in curice, and it was for the jury to judge eventually of the degree of credit they were entitled to. As to the second objection, it is a rule of law, and a true one, that fraud is never to be presumed, unless proved, either positively, or from such strong and unequivocal circumstances, as to leave no doubt upon the mind on the subject. In this case it did not appear that any seductive arts were practised, either by Dr, or Mrs. Netting, upon this old lady to cancel this will, nor did any of the *225 circumstances, either before or after the transaction, justify such a conclusion. It appeared, it is true, from some parts of the testimony, that Mrs. Hardcastle had taken an antipathy to Mrs. JYettmg, and particularly from a letter she had written to Mrs. Palmer, but it seems equally true, that as soon as she had had a personal interview ■with her relation, Mrs. JYelling, all her former kindnesses and affection seem to have returned, and she relented of all the unkind suspicions she had entertained towards her, which, she said, she Was convinced were groundless and unfounded. And as to the idea of her insanity, at the time of cancelling the will, there certainly was no proof of it: and the rule of law upon this head I take to be well established, Sanity is always to be presumed. But if insanity is alleged, it must be proved. In cases, however, where a mental derangement has once overtaken a man, or where he is subject to it occasionally, but at times has lucid intervals, the burden of proof lays upon the advocates for a sound mind to prove sanity. In this case, nothing like insanity was ever proved against Mrs. Hardcastle; that she was weak and infirm there can be no doubt, and that her faculties were not so strong as when in good health, appears to be equally certain, but no mental derangement, or habitual insanity was proved against her, as far as. I have been able to collect, from any part of the testimony, and the little inconsistencies in her conduct may be ea *226 sily and charitably accounted for by her weak and enfeebled state and condition; without any near or endearing relations around her, surrounded by strangers, unconnected with her by the ties of consanguinity. All these, however, were facts for the consideration of the Jury, to whom the cause was submitted; they had the whole case before them, with all its circumstances on both sides of the question, aided by the talents and abili-' ties of the counsel, able and learned in the law; and after a lengthy and patient investigation of the subject, they have by their verdict, said and pronounced that the second will, made by Mrs. Hardcastle, was cancelled and revoked, and that she died intestate, thereby reversing the decree of the Court of Ordinary in favour of the will.
The Jury are the proper judges of the degree of credit tobe given to witnesses, whose incompeteucy is removed by a release of their eventual interest.
Fraud is never to be presumed— must be proved positively, or from strong unequivocal circuma¿anees.
SanHyofate3.. be^rraumeaftíe ESsane.IS once
*226 It only now remains to examine whether there are legal grounds for the new trial prayed for or not. It was admitted in the argument in favour of the appellees, that if the presiding Judge had submitted the facts to the jury, unaccompanied with any observations of his own, they would have submitted to the verdict with respectful deference; but as he had made a great number of observations upon the facts of the ccse, and has mistaken, or mis-stated many of them to the jury, which were calculated to mislead them, they were fatal to the verdict, and were good grounds for a new trial. If this doctrine, which was not contended for, in the strict sense laid down by the counsel, for the appellees, was established to be the law of the land, almost every verdici *227 given in our Courts of Justice, would be impeached and set aside, for some mistake or omission, on the part of a Judge who tried the cause. Humanum est errare, no man is perfect, and the most upright, able, and circumspect judge living, may be subject to mistakes and omissions, and consequently may not state every point of a long and intricate case with sufficient precision to a jury; but in every case of that kind it is ultimately for the jury to determine, and judge for themselves of all the facts of every case; they are the constitutional judges of facts;, and facts are, and ever have been, peculiarly within their province. If a Judge mistakes the law, in charging a-jury, or if he admits of evidence which should be rejected, or rejects evidence which ought to be admitted, there are good grounds for a new trial in most cases ; because it is the province and duty of the Judge to explain the law to the jury. Lor’d Hale, in his History of .the mon Law, treating of the duties of Judges and juries, lays it down as a rule, (and perhaps the best one existing,) “That the Judge .who presides, should always direct the jury, in matters of law, before they retire or withdraw, and also assist them, as to matters of fact; weighing the evidence before them, and observing where the main question or knot of the business lies; and sometimes by giving an opinion, even in matters of fact; Which, he says, is a great advantage to Laymen^ andthus,” he-adds, “as the jury assists the Judge *228 in .determining matters of fact; so the Judge assists the jury in determining matters of law, and , veiT much m investigating matters of fact, where the jury are the final judges." (Hale's History of the Common Law, 256, 257.) From which I infer that although a J udge may, when he thinks the case requires it, go into facts in his observations to a jury, and even sometimes give his opinion upon them; yet the jury are the constitutional and final judges of those facts, and may find a verdict corresponding with, or against his ideas upon the subject, as they may think the weight of evidence preponderates, and I trust that this Court will never invade the constitutional power of the jury as to facts, where no rule of law is violated. In the case under consideration, the presiding judge did go pretty much at large into the case, and gave his sentiments and deductions to the jury on different parts of the testimony offered; and although his conclusions did not meet the views of the appellees, yet they had the approbation of the jury who tried the cause. Upon the whole, as this case has undergone a very serious and laborious investigation in the Court of Ordinary, and afterwards in the District Court, it is not probable that any further light can possibly be thrown upon the subject; and it does not appear that any rule of law has been violated by the finding of the jury, or that any evidence has been admitted which ought to have been refused, or any rejected which ought to have been admitted. *229 I do not see, therefore, any legal grounds to disturb this verdict.
pro-IcyourUDdthe Ju''
Prioleau, for the motion.
K. L. Simons, contra.
lam, therefore, of opinion, that the new trial should be refused, and in this my brethren cur with me in opinion.
The other Judges concurred.
Cheves, J. gave no opinion, having been of counsel in the case.